We welcome Judge Lynn, who has joined our panel, and our last case this morning is SELPA CONSTRUCTION V USPS. When you're ready, Mr. Weinstein, call. Yes, Your Honor. May it please the Court, this is quite simply a case where the board never did make an attempt to see the forest. Its opinion and its analysis of this case is based on looking at a bunch of individual trees. It was very interesting walking in this morning, looking at the engraving down in the lobby, that it is as much the duty of government to render prompt justice against itself in favor of citizens as it is to administer the same between private individuals. It came to mind because it appeared all through the opinion that the board, and only one of the judges actually saw the case, was seeking to cover for the Postal Service from beginning to end in a contract that, at least in my experience, is the most horrendously administered and abusive treatment of a contract that I've ever seen. Your briefs seem to have contentions over the facts, but of course this body doesn't find new facts. It feels bound by the facts below. So is there an error of law or some grossly missed fact that would require us to reconsider the judgment of the board? Yes, Your Honor, there is. Essentially, the Postal Service pronounced a death sentence on a contractor that it delayed from a 270-day contract by 570 excusable days. But there were eight different modifications entered into. There were. There was a recognition, was there not, on the part of the government that there were problems here, serious problems. Oh yes, oh yes. And the government agreed to and entered into modifications and agreed to extend the performance time in accordance with those modifications and agreed to increase the payments under the contract to accommodate those modifications. So in what respect was the government's conduct so inappropriate here? Because at the very beginning of the project, when the first series of problems were discovered, defects in the plans, the contractor who, I think it's very important to understand here the relationship between Puerto Rico and the United States. This is Puerto Rico. The contractor did require that he be able to speak English. And this contractor had done a previous Postal Service contract successfully and was commended for it. But to say that he had command of English is a different question. He's an eighth grade, slow person, salt of the earth kind of a guy, a hardworking, decent, honest person. And what happened was he told the contracting officer's representative at the outset, this is a disaster, this project should be torn down. And the contracting officer's representative told the contracting officer that. But they chose not to tear it down. They told him, wait while we fix these problems with our designer, which was in New Jersey. And what are those facts again? Correct. And those facts, we're going to have to stick with the board's facts. I agree. Unless there's something really out of place. Well, what's out of place is the appreciation of the facts was clearly an erroneous analysis of what happened. By looking at those facts one by one and not looking at them in the aggregate, you don't see that this is a breach of contract in virtually every way it can happen in construction. But that sounds like a closing argument more than an appellate issue. In order for the court of appeals to determine that the facts were not found in a way that they're entitled to any deference, you have to show that there was bad faith or that there was some kind of corruption in the process or that the board's view, well what's the evidence of that? I can understand completely, given the way that your client sees the facts, why he would be extremely upset with the decision. But that's not the same thing as saying that there was an error. So what evidence is there that the board abdicated its function as a neutral fact finder? Well, because the board said that in each modification the contractor waived its right to extended overhead. But the board never analyzed it from the point of view of a breach of contract. And the law on breach of contract is that where there's a material breach, the contractor is excused from its obligations under the contract, which would include its waiver and the negotiation of those modifications when you look at the overall impact. Where's the breach of contract? The breach of contract is virtually every way that a contract can be breached. Give us the most important one that requires us to send this back. First of all, the Postal Service withheld superior knowledge. They did not provide the as-builts of the building that was being renovated and expanded. Second, they furnished woefully defective plans and specifications. The board, again, let's just deal with the first one. But the board says that was a changed circumstance, not a lack of knowledge, not withheld knowledge, just something that surprised both of the parties. And that changed circumstance was accounted for in a modification. Now where is the error? Partially. And the April meeting right after the project started, the contractor who I said is inarticulate. But in the modification, you agree to the modification saying this constitutes a full settlement of all our disagreements. That's correct. And there is a factual finding there that is intended to foreclose any discussion of that. The contractor's testimony was very clear, but the judge didn't want to listen to it. But again, you have to look at the whole picture to appreciate how clearly erroneous the determinations are that there was no breach here and to not compensate the contractor, A, for the cumulative impact on the project, and B, for the termination at 97% completion, which is not in doubt. Remember, it's 97% complete, but they bring somebody else in and it takes them over a year to finish. That doesn't sound to me like 97% complete. Unless you've ever had a car repaired and then break again and take it to a different mechanic, especially when somebody else is paying the bill, like the surety. So you think the next contractor milked the system? There's no dispute that it was 97% complete. The reason, in our estimation, that the project was terminated was because it could not be completed. It was such a disaster. There were so many mistakes and errors in everything that even finished the way it was designed, it would have been a difficult project to utilize. So they brought in a new contractor who redid the whole thing. With respect to the 97% completion, that seems to be in some doubt. The board found that of the items on this 300 or almost 300 item punch list that remained to be finished, there were several items that prevented the occupancy and use of the building. So these were not just, it wasn't just, you know, you need to touch up a little paint here or there. There were things like it was not handicapped accessible, there were no emergency exit lights, security cameras were not installed, etc., etc. There's a whole long list here of things the board found were not completed. That's correct. That made the building uninhabitable for its intended use. That's what the board found. But what the board didn't look at was that there was 3% of the work to be performed, and that was the rate of the entire project because of the 570 days of delay. About 3% per month was all that the contractor was able to do when it was supposed to be many times that because it was a 9-month project. It went 28 months. So if you look again at the totality of what happened, it's almost incomprehensible that there was not a breach here. And even if the contracting officer's representative's memory was faulty in all the right places, he didn't remember or I didn't say that or whatever, why would a contractor work almost 2 years without receiving any extended overhead, without any blame for the delays? It just doesn't make sense. It's so glaringly absurd that you could do that. And then if you look towards the end where each little action by the government in respect of making payments and withholding a check or making a check incorrectly or not releasing retainage, it's kind of like you hire someone to go dive for pearls, and while they're down there, you're holding the air so they're just barely alive, and at the end you just shut it off, and then you blame them for dying. And it's really kind of what happened. And so the idea is the findings, one by one, don't look like bad faith. But when you look at them all together, they reek of bad faith, or in more accurate terminology, of sharp dealing, which the government is obligated to do, and the government is supposed to not take advantage of people. And the fact is, the contracting officer testified, the contracting officer had 35 years' experience, that he didn't know what extended overhead was. That's incomprehensible. I mean, it all adds up to what almost inevitably has to be bad faith, or at the very least, an egregious breach of contract, which gives the contractor the right to his damages to be put back in the pecuniary place that it would have been without the breach. What evidence of bad faith can you point us to, specifically? Refusing to issue a check in contravention of the contractor's request, and then refusing to reissue it. Refusing to, in any way, acknowledge that the inability of the contractor to pay subs and to perform in the last month was due to the fact that they asphyxiated him over 840 days on a little simple project. To the point where... But do you have evidence that the government did this maliciously, or intentionally, or deliberately to frustrate your client? Well, the evidence would be that the government, there is evidence in the record, that the government didn't have any money, they were terrified of going back to headquarters to try to get more money, they'd exceeded their budget, and they were utterly unsympathetic to the financial interests of the contractor. When he tried to demobilize, they told him not to. That's in the record. When he said, he laid off a bunch of people, but he kept working because they made him. And the record is replete with internal emails of the Coastal Service where they're covering up their errors in the design, their errors in the administration, their errors in every aspect of this contract. So, at the end of the day, all of the causes of the default were the government's responsibility. The government caused this guy to default. They tied his hands, his legs, gagged him and bound him, and then said, you're not finishing the job, you're fired. And as a result of it, to go to the issue of what happened afterwards, the contractor, this poor, decent guy, lost everything he had. His home, his business, his property, everything. He was wiped out. Would you like to say some of your rebuttals? I would, yes, just a couple. Let's hear from Mr. Grimaldi. Good morning, Your Honor. May I please the Court? Your Honors, Sulta here wishes this Court to infer a bridge, to infer a bad faith, without proving it by clear and convincing evidence whatsoever. Your Honors have hit the nail on the head when you say that there's arguments with contentions of facts here, there's contentions of facts here, as opposed to pointing to legal error. This can be seen in the three major cases. The three claims, the appeals they bring here, the justification and termination for default, couldn't get that one out, Your Honors, no bad faith, and the extended overhead waiver. Sulta simply disagrees with the facts here in each one of these. Turning to the bad faith first, Your Honors, there's been no clear and convincing evidence shown here of bad faith on the part of the Postal Service. There's been no showing of an intent to injure Sulta whatsoever, just an inference. As counsel all said, there was no money left. They were unsympathetic, the Post Office was. They didn't want to ask for more money. This is just asking this Court to make an inference of bad faith, not showing clear and convincing evidence as required by AMPRO. Here the Board found there was no intent to injure Sulta, and Sulta simply has not shown that there was any error here. Turning to the extended overhead, Your Honors. Mr. Weinstein-Bacall does kind of invoke a point of common sense that why would the contractor have continued pouring time and effort into this if there weren't some kind of understanding with the government that there would have been a full compensation for his efforts? Well, Your Honor, there are many reasons why a contractor would want to continue the project, or beyond seeking simply extended overhead afterwards. They could have just prided the project and wanted to finish it and complete this thing. There is nothing in the record to question the Board's finding that there was no reservation of extended overhead prior to these modifications being signed whatsoever. In fact, Sulta doesn't even challenge this reservation language whatsoever. It does not say that there is something ambiguous about it that would exclude extrinsic evidence, that would allow extrinsic evidence and perhaps allow some extended overhead here. They simply say there was duress, there was some sort of corrosion here. The Board found there was no duress, and Sulta simply disagrees with that finding. And that's it. They say that the threat of default was coercion, but under the Leap Year case, stating your contractual rights that you could terminate a contract for default, the government could terminate it for default, and the penalties it would follow afterwards is not coercive. Also, the timing is incorrect about this, Your Honors. Modifications 1 and 2 were signed before the first cure notice. Seven months passed after that first cure notice, and then modification 3 occurred, then 4 through 6, and then the second cure notice. So there wasn't any time period here showing coercion and then some effect of that coercion by entering into these modifications. They occurred before the first alleged coercive act. There were a real series of difficulties here. Unsuitable soils, a back wall that turns out to be a supporting wall, and nobody knew it. Specifications went through multiple alterations. There does seem to be a chain of errors here that just multiplies one on top of another. Why shouldn't we maybe give some consideration to that? Well, Your Honor, in this situation, there were seven modifications and a proposed eighth one that was, while not signed, was actually acted upon that took care of these errors. Money was granted to SELPA and extra time, some 563 days. So if there were errors, Your Honor, they've been rectified contractually. There's no need to worry about them at this point. But you have to agree that there were some very serious problems in what started out to be a relatively simple, straightforward project that turned out to be nothing short of a nightmare for everybody. Serious, serious problems that caused serious delays. And I agree with you. The government entered into modifications and tried to address those issues. And then the contractor obviously ran into some financial difficulties. And it seems to me that there is at least some sympathy to the argument that the contractor was trying to finish this project through all of these difficulties. And there are some aspects of this that seem a little harsh. Don't you agree? Well, Your Honor, I would agree. To end the contract when it was relatively close to being finished, at least the contractor could come away with his business intact and with some pride of completion or whatever and whatever financial remedies come with that. Well, it's an honor to address that. I think first we should talk about what was actually left to do at this facility and then on top of it, why that termination default actually occurred. There were some 294 different things within this initial punch list that need to be completed before, Your Honor, you listed the handicap ramps, the emergency doors. There were some other basic things like counters and drop boxes, meaning customers couldn't come in and actually purchase post office services. We don't know how difficult it would have been to finish up those things and maybe they could have all been done in a couple of weeks. Well, Your Honor, I would say that we do know it would take a year and cost $1.6 million to get this building renovated to be the post office that the Postal Service bargained for. Well, that may not necessarily be the proper measure here. By the way, how do you account for that? This was a $2.2 million contract and it cost $1.6 million to complete it after it was 97% complete. Well, Your Honor, first... That's a tough one to figure out. It is a substantially more amount of money, Your Honor. The contracting officer representative, Mr. Manka, he actually testified that he believed there was somewhere between 80% to 85% of the project was complete as opposed to 97%, so there is some dispute. But still, even if it was 15% to go instead of 3%, they spent almost the entire contract price on that. Some of the money was spent repairing some of the things that Selva had already finished. They were deficient. I don't have a site view and a record, Your Honor, as to what money went to where, but there were some, I guess, repairs that had to be due to deficient work. I know that Selva disputes that and say that the next contractor was trying to run up the bill here, but there's simply no evidence of that. It's just an inference, once again. And, Your Honor, going back to why this was terminated. By default, the contracting officer, as can be seen on the appendix page, Roman numeral 29, the contracting officer terminated this contract because of the amount of work that was left. And this was the amount that was conceded by Selva here, that it's $160,000 that Selva believed was left. Selva's inability to pay its subs. Selva had said it needed the surety support and surety had stopped paying. And its request for the government to pay these subs directly. So the Postal Service was aware that while Selva might have had good intentions to finish this project, they were not going to be able to. As such, Your Honor, termination by default was completely justified. This Court has no further questions. Thank you, Mr. Grimaldi. Thank you. Mr. Weinstein, you have a call. You have a little over two minutes. Yes, Your Honor. First of all, in the case of Boston Shipyard, the First Circuit ruled that financial incapacity is generally considered beyond the contractor's control. But if financial problems are caused by factors beyond the contractor's control or by the government's actions themselves, then the contractor's default may be justified. This is such a case. I've never seen a case that more appropriately suits that. That's just one issue. You presented that whole argument, or counsel presented that whole argument to the Board, correct? Correct. The Board ignored it. Well, sure. But the arguments before them, they had a factual record upon which to assess them. Yes, they did. And they didn't accept it. So, sure, I mean, I would be very upset about that myself if that happened to me. But what did they do legally? I mean, the Court of Appeals isn't another trial court. I understand. It's the Board. So what's wrong with what they did legally? I understand why it's wrong factually, morally, and all the other ways in which you're arguing. But what is the legal error that would be the basis  when they were actually presented to the Board? It would be that the findings were clearly erroneous in light of the facts that were found. And looking at the termination... How do we make that judgment, though? Looking at the findings of fact of the court... A few minutes here, and we've got written briefs. How do we get into the documents and hear the witnesses and whatever else is involved in making fact findings? Well, that's all part of the record that was transmitted to the court. And the Board made credibility findings? There were factual disputes about whether conversations occurred or what was said? They made findings about that? I agree. But if you look simply at the time issue, there's a cardinal change in this contract. It was a simple little contract that, as Chief Judge Rader pointed out, cost almost as much to do the last 3% of, and there is no dispute that the project was 97% complete. That was the inspector's conclusion. They did not quarrel with it. When they terminated for being delayed, it was based on, admittedly, from Manka, a guesstimate. He destroyed a company and its owners on a guesstimate. Selfless past promises of completion were a basis. Well, how could they know when they were going to complete? The project was being redesigned from beginning to end. It never achieved final design. Inability to pay itself was caused by the government's conduct, which broke selfless back. The inability to use it as a post office. The evidence was clear. There was no item on that punch list that would have taken more than a month to complete. One month out of 28. And the unfinished work. Again, Manka's testimony was he didn't know what they had done in the last month or so. Do you have a final thought for us, Mr. Weinstein, to call? I'm sorry? Your time has expired. Do you have a final thought? Yes. I think at this point, this court has an opportunity to expand the appreciation of what it means for the government to act in bad faith. And what a breach is, what kind of cumulative behavior constitutes a breach of contract that entitles a party to be compensated and put back in the place it would have been without the breach. Thank you. Thank you very much. All rise. General report adjourned until tomorrow morning at 10 a.m.